UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | Civil No: 11-148-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ICG HAZARD, LLC | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

Cross motions for summary judgment pertaining to liability have been filed in this bifurcated action. At issue is whether Defendant ICG is liable for discharging water containing pollutants in violation of the Clean Water Act and/or the Surface Mining Control and Reclamation Act. For the reasons set forth below, the Court GRANTS ICG's motion as to Counts One and Two and DENIES both Sierra Club's and ICG's motions as to Counts Three and Five. With regard to Count Four, for which summary judgment was not sought by Sierra Club, the Court DENIES ICG's motion.

I.

A.

Sierra Club's Complaint [R. 20] contains five claims.[1] These allege that ICG's Thunder Ridge Mine, located in Leslie County, Kentucky, discharged water that violated Kentucky's water quality standards. The assertion is that the water contained an excess amount of selenium and was

---

[1] The complaint from 6:11-cv-325, an action that was consolidated with the above cited action, does not assert any new claims. Rather, it asserts additional violations of the already asserted claims.

overly conductive. [*Id*.]  Selenium is a naturally occurring element found in the environment, and it "impacts the reproductive cycle of many aquatic species, can impair the development and survival of fish, and can even damage gills or other organs of aquatic organisms" when it rises to particular concentrations. *Ohio Valley Envtl. Coal. v. Hobet Mining LLC*, 723 F. Supp. 2d 886, 900 (S.D. W.Va. 2010).  Water with too much conductivity can also harm indigenous aquatic life. [R. 20 at 11-13.]  These harms, in turn, diminish the aesthetic value of the stream, claim Sierra Club members Teri Blanton and Lane Boldman.[2] [R. 42 at 12-16.]

ICG is alleged to be subject to limitations on its discharges because of two interconnected federal statutes, each effectuated through Kentucky administrative agencies.  The Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*, more commonly referred to as the Clean Water Act (CWA), provides the basis for Sierra Club's first claim and is integral to its second claim.  The Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 *et seq*, is the vehicle by which Sierra Club asserts the remaining three claims. [R. 1.]

The CWA was "designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 469-70 (6th Cir. 2008) (internal quotation marks omitted) (quoting another source).  This goal is achieved, in part, by requiring all "individual point-source discharger[s] [to] obtain and adhere to the terms of a National Pollutant Discharge Elimination System (NPDES) permit issued by the EPA or an EPA-authorized state agency." *Id*. at 270 (quoting 33 U.S.C. § 1342(a)-(d)).  Kentucky possesses the ability to issue permits, called Kentucky Pollutant Discharge Elimination System (KPDES) permits, *id*., and it does so through the Kentucky Department of Water. 401 Ky. Admin Regs. (KAR) 5:050 (2012); [R. 42 at 5.]  ICG's Thunder Ridge Mine has been permitted under the

---

[2] ICG has not challenged Sierra Club's standing to bring this action, and the Court finds that Sierra Club indeed has met this jurisdictional prerequisite. [*See* R. 42 at 11-18 (explaining how the standing requirements were met).]

2

KPDES Coal General Permit since 1991. [R. 40, Ex. 1 at 8.]  The permit covering Thunder Ridge

was renewed on August 1, 2009 when the Coal General Permit's most recent iteration became

effective. [R. 40, Ex. 2 at 1; R. 40, Ex. 9 at 1.]  Utilizing the CWA's citizen suit provision, 33

U.S.C. § 1365, Sierra Club alleges that ICG has violated, and continues to violate, the conditions

of its KPDES Permit.[3]  Specifically, ICG is accused of discharging selenium—a pollutant not

authorized for discharge by Permit KYG043540—into waters that flow through and around ICG's

Thunder Ridge Mine.

        The SMCRA was enacted to establish "a nationwide program to protect society and the

environment from the adverse effects of surface coal mining." § 1202(a).  Congress clearly acted

to protect the environment, but it also recognized coal's utility and sought to balance those dual

interests. 30 U.S.C. § 1202(f).   In effect, the SMCRA requires any party who engages in surface

coal mining to obtain and comply with a permit issued by a federally approved state agency or, if a

state lacks such an agency, the federal Office of Surface Mining Reclamation and Enforcement

(OSM). § 1256(a); *In re Surface Mining Regulation Litigation*, 627 F.2d 1346, 1350 (D.C. Cir.

1980).  Kentucky's Department of Natural Resources (KDNR) has been approved by the OSM and

issues surface mining permits in accordance with Kentucky statute, Ky. Rev. Stat. (KRS) § 350,

and regulations, 405 KAR 7-24, which were drafted based on requirements set forth in the

SMCRA. *See Southern Ohio Coal Co. v. Office of Surface Mining*, 20 F.3d 1418, 1421 (6th Cir.

1994).  ICG possesses a mining permit for Thunder Ridge, 866-0281 [R. 42 at 19; R. 41, Ex. 4],

issued by the KDNR.  Sierra Club does not contest that fact.  Instead, Sierra Club argues that ICG

---

[3] To the extent ICG challenges Sierra Club's ability to raise claims using each statute's respective citizen suit
provision, that challenge is not well-founded. [*See* R. 40, Ex. 1 at 18-20 (discussing Sierra Club's CWA cause of
action); *id*. at 20-24 (discussing Sierra Club's SMCRA cause of action).]  Sierra Club's filings reveal dissatisfaction
with the terms of the general permit, but its central challenge is focused on whether the conditions of the permit were
violated. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 260 n.2 (4th Cir. 2001).  Sierra
Club's SMCRA claims do not suffer from the same constitutional problem confronted in *Bragg v. W. Va. Coal Ass'n*,
248 F.3d 275 (4th Cir. 2001) and are akin to the claims for which jurisdiction was found to be proper in *Molinary v.
Powell Mountain Coal Comp.*, 125 F.3d 231 (4th Cir. 1997).

has violated conditions of the permit through discharges of pollutants into waters around Thunder Ridge that exceed Kentucky's numeric and narrative water quality standards. [R. 42 at 20-21 (citing 405 KAR 16:070 § 1(1)(g)); R. 42 at 4 (citing numeric water quality standards located at 401 KAR 10:031 § 6 tbl.1); R. 20 at 17 (citing narrative water quality standards located at 401 KAR 10:031 §§ 2(1)(d), 4(1)(f).] Sierra Club is permitted to bring this suit by the citizen suit provision of the SMCRA. 30 U.S.C. § 1270(a)(1).

## B.

The facts in this case are not a source of significant dispute, [R. 63 at 75-77], and are outlined extensively in the parties' briefs and attachments [*See, e.g.*, R. 20 at 9-13; R. 42 at 6-11]. Sierra Club became aware that ICG was discharging selenium from the Thunder Ridge Mine when ICG was in the process of obtaining an amended surface mining permit, allowing ICG to mine additional acreage. [R. 42 at 7; R. 41, Ex. 4.] In obtaining approval to expand Thunder Ridge, ICG also had to apply for a modification of its NPDES permit, which involved submitting water samples from outfalls around the mine. The sample from outfall twenty revealed a selenium value that exceeded Kentucky's acute water quality standard [R. 42 at 7; R. 41, Ex. 5 at 8.] On December 3, 2010, Sierra Club notified ICG that it intended to bring a citizen suit under the CWA and SMCRA based on ICG's discharge. [R. 40, Ex. 10.] That same day, Teri Blanton, with Sierra Club's support, sent a letter to the KDNR and the OSM requesting an inspection of KPDES outfalls to test for selenium discharges. [R. 41, Ex. 12.] The OSM responded to Blanton's letter by issuing a Ten Day Notice. This notice was issued because OSM had "sufficient reason to believe a violation" had occurred. [*See* R. 41, Ex. 13.]

KDNR responded to Sierra Club's letter and the Ten Day Notice by conducting additional testing on January 7, 2011. [R. 41, Ex. 13.] This testing was done at several ponds, two of which

contained selenium that exceeded the prescribed state standard, but the KDNR concluded in a letter dated January 26, 2011 that "no violations of the applicable regulatory standards" took place. [R. 41, Ex. 13 at 1.]  In a subsequent letter addressed to the OSM, dated March 1, 2011, the KDNR noted that two of ICG's sediment structures had levels of selenium that exceeded Kentucky's chronic water quality standard of 5 μg/l. [R. 41, Ex. 14.]  Consequently, the KDNR required ICG to sample particular sediment structures for selenium during April, May, and June of 2011 "as a preventive enforcement action" in accordance with "405 KAR 16:060 § (1)(3) and 405 KAR 16:070 § 1(1)(g)." [*Id*. at 1-2.]  The KDNR indicated they would forward the results from those samples to the OSM. [*Id*. at 2.]

The OSM, relying on KDNR's actions, wrote to Sierra Club on March 22, 2011.  That letter summarized Blanton and Sierra Club's claims and stated that OSM was satisfied that KDNR had met the "good cause" justification provided for by 30 C.F.R. § 842.11(b)(1)(ii)(B)(1)-(4).  The OSM referenced KDNR's inspection and made several conclusions and observations.  First, "[n]one of [KDNR's] samples exceeded the acute limit of 20 μg/l." [R. 40, Ex. 11 at 3.]  Second, although ICG's KPDES permit only requires a one-time monitoring for, among other things, selenium, in response to Sierra Club's inquiry, the KDNR will require additional testing, as noted above. [*Id*.]  Third, and most importantly, OSM concluded that "no present violation exists," satisfying one of the necessary prongs for finding "good cause" and not taking enforcement action. [*Id*.]

The April, May, and June testing indicated that particular discharges continued to exceed Kentucky's chronic standard for selenium. [R. 42 at 9; R. 41, Ex. 15.]  Sierra Club engaged in additional testing in November and December of 2011.  Through the services of a private testing company, Sierra Club found that discharges continued to exceed 5 μg/l of selenium in particular

locations. [R. 42 at 10; R. 41, Ex. 16-17.]  One of the locations was Pond 1805A, which had been a consistent source of excess selenium.  A second location was not identified as specifically, only being described as taken in Bonnet Rock Branch. [R. 42 at 11.]

## II.

Two processes were set in place to help achieve the CWA's goal of restoring and maintaining the integrity of the waters of the United States. *Ky. Waterways Alliance*, 540 F.3d at 470 (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992)).  First, the EPA is empowered to establish limitations on "discharges into the country's navigable waters from point sources." *Id*. (quoting *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994)).  The NPDES permit (or KPDES permit) is the mechanism used to limit discharges, and it functions by setting terms—e.g. limitations on the discharge of certain pollutants or testing requirements—with which dischargers must comply. *See* 33 U.S.C. § 1342; *see generally* 40 C.F.R. § 122.  Although the permit limits dischargers, compliance with it also enables dischargers to utilize the permit shield, 33 U.S.C. § 1342(k), which "constitutes an exception to the general strict liability of the CWA." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 267 (4th Cir. 2001).  Second, each state is mandated to create "comprehensive water quality standards establishing water quality goals for all intrastate waters." *Ky. Waterways Alliance*, 540 F.3d at 470 (quoting *PUD No. 1*, 511 U.S. at 704)).  The standards must be approved by the federal government, and they ensure that waters are not unlawfully degraded by the aggregate of discharges from NPDES-compliant parties.  *Id*. (quoting *PUD No. 1*, 511 U.S. at 704)).

The CWA claim in this matter pertains to the NPDES system.[4]  Sierra Club claims that ICG has discharged selenium from point sources into navigable waters without a permit.  As a

---

[4] For clarity's sake, NPDES will be used when describing the CWA and its structure more broadly.  KPDES will be used when referring to the specific permit at issue in this case.

foundation for its claim, Sierra Club cites the KPDES Coal General Permit, which ICG operates under, and the effluent limitations[5] it places on various pollutants, including suspended solids, iron, and manganese, but importantly, not on selenium. [*See, e.g.*, R. 40, Ex. 2 at 2.]  Instead, the Coal General Permit requires "each existing mining operation authorized by this general permit [to] conduct and submit . . . a one-time analysis for . . . selenium." [*Id*. at 16.]  Sierra Club examines the fact that ICG's selenium discharges are not limited in their KPDES general permit through the paradigm of a 1995 EPA policy statement on the scope of a permit shield and concludes that such discharges are unpermitted and ICG is unshielded. [R. 42 at 24.]  The Court draws a different conclusion and denies Sierra Club's motion for summary judgment as to Counts One and Two and grants ICG's motion for summary judgment on those counts.

## A.

NPDES permits come in two forms—individual permits, 40 C.F.R. § 122.21, and general permits, 40 C.F.R. § 122.28.  For a period of time, individual permits were predominately used, and in fact, it was unclear whether general permits were even statutorily permitted. Office of Water Enforcement and Permits, U.S. Envtl. Prot. Agency, General Permit Program Guidance 1, 5 (1988) [hereinafter General Permit Guidance].  Opinions in two cases in the 1970s approved the use of general permits, and guidelines explaining the circumstances when general permits would be available were then drafted. *Id*. at 5.  The final regulations governing general permits were published in 1979 and eventually codified in their current form at 40 C.F.R. § 122.28. General Permit Guidance at 6-8.

---

[5] "The term 'effluent limitation' means any restrictions established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents, which are discharged from point sources into navigable waters . . . ." 33 U.S.C. § 1362(11).

An individual permit is necessary if a discharger cannot or does not receive a general permit. *Id.* at 9. Individual permits are written by the EPA or authorized state agency after consideration of generally applicable effluent limits and an individual discharger's disclosures. *Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964, at *9 (1998) (cited by *Piney Run Preservation Ass'n*, 268 F.3d at 268). Issuance of an individual permit, then, is a reactionary measure by the permitting authority to a specific discharger's application, including that discharger's disclosures.

In contrast, general permits are written without individual disclosure. General Permit Guidance at 2-3. A general permit is typically issued upon the permitting authority's initiative, but a group of dischargers can also request to be covered by a general permit. *Id.* at 12. Regardless of who initiates the general permitting process, a general permit is only able to be utilized when the practices of the entire industry in a specific geographic area meet five criteria: the "categories or subcategories of discharges . . . or disposal practices or facilities all":

> (A) Involve the same or substantially similar types of operations;
> (B) Discharge the same types of wastes or engage in the same types of sludge use or disposal practices;
> (C) Require the same effluent limitations, operating conditions, or standards for sewage sludge use or disposal;
> (D) Require the same or similar monitoring; and
> (E) In the opinion of the Director, are more appropriately controlled under a general permit than under individual permits.

40 C.F.R. § 122.28(a)(2)(ii)(A)-(E); *see also* General Permit Guidance at 12-17. Although the aforementioned similarities must be found, "the permit writer has the latitude to fashion the general permit to cover varying operations, wastes, effluent, limitations and operating conditions, and monitoring requirements." General Permit Guidance at 20. After those criteria are met, "the permit writer develops a draft general permit incorporating the necessary terms and conditions." *Id.* "Then, rather than apply for an individual permit, operators must file a Notice of Intent (NOI)

stating that they plan to operate under the general permit, and absent a negative ruling by the

agency, discharges that comply with the terms of the general permit are automatically authorized."

*Ky. Waterways Alliance*, 540 F.3d at 482 n.10 (Clay, J. dissenting) (quoting *Tx. Indep. Producers*

*& Royalty Owners Assoc. v. EPA,* 410 F.3d 964, 968 (7th Cir.2005)).

   The EPA believes that both dischargers and permitting authorities benefit from the

issuance of general permits. General Permit Guidance at 2-3, 33-35.  Permits can be issued more

quickly because one permit can cover an entire category of dischargers. *Id.* at 2.  This can reduce

paperwork for all parties and ensure that permits are timely issued. *Id.*  In turn, permitting

authorities may be able to use newly available time to regulate dischargers that were previously

unpermitted. *Id.*  Finally, dischargers are aided by avoiding, in most cases, the "sampling and

analysis associated with individual permit applications." *Id.* at 3.

   In spite of the different permitting processes, "[a] general permit is identical to an

individual permit regarding effluent limitation, water quality standards, monitoring and sampling

requirements, and enforceability." *Id.* at 3-4.  The enforceability is the same, but the process of

enforcement—including the use of the permit shield—must be different because of the distinct

way each permit is acquired.

**B.**

   Permits place limits on the pollutants that may be discharged, but permits also protect

dischargers.  This is accomplished through the "permit shield." 33 U.S.C. § 1342(k).  In *du Pont de*

*Nemours & Co. v. Train*, 430 US 112, 138 n.28 (1977), the Supreme Court discussed the shield: its

purpose is to "insulate permit holders from changes in various regulations during the period of a

permit and to relieve them of having to litigate in an enforcement action the question whether their

permits are sufficiently strict. In short, § [1342](k) serves the purpose of giving permits finality."

The scope of protection for dischargers with individual permits has been clearly stated and includes all of the following:

> 1) Pollutants specifically limited in the permit or pollutants which the permit, fact sheet, or administrative record explicitly identify as controlled through indicator parameters;
> 2) Pollutants for which the permit authority has not established limits or other permit conditions, but which are specifically identified in writing as present in facility discharges during the permit application process and contained in the administrative record which is available to the public; and
> 3) Pollutants not identified as present in the facility discharges but which are constituents of wastestreams, operations or processes that were clearly identified in writing during the permit application process and contained in the administrative record which is available to the public.

EPA, Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES Permits, at 2-3 (1995) [hereinafter Revised Policy Statement]; *see also Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964, at *9; *Piney Run Pres. Ass'n.*, 268 F.3d at 268; *Atlantic States Legal Found., Inc. v. Eastman Kodak Comp.*, 12 F.3d 353 (2nd Cir. 1994) (predating the Revised Policy Statement, but reaching a conclusion that was affirmed in *Ketchikan Pulp Co.*).  In simpler and more direct terms, the holder of an individual permit is able to discharge pollutants within limits established by the permit, and a permit holder can lawfully discharge any pollutants not listed as long as proper disclosure was made during the permitting process. *Piney Run Pres. Ass'n*, 268 F.3d at 268 (citing *Ketchikan Pulp Co.*).  Proper disclosure, of course, is judged by whether facility discharges, wastestreams, operations, and/or processes were sufficiently identified.  Thus, at least in the context of an individual permit, it is clear that pollutants not listed in the permit can be legally discharged.

Sierra Club concedes the aforementioned conclusion is accurate, but it believes the general permit shield is different.  Sierra Club's position rests on two foundations, neither of which support the argument being advanced.

First, Sierra Club contends that the scope of the shield for general permits is narrower because general permits are acquired with fewer disclosures: "[b]ecause the permitting authority lacks detailed information about individual discharges when issuing a general permit, the scope of a general permit is defined by the effluent limitations present in the permit." [R. 42 at 24.]  No cited authority states that proposition, and there are several facts that undermine this argument. The EPA's General Permit Guidance document summarizes this idea.  In it, the EPA states:

> A general permit is identical to an individual permit regarding effluent limitations, water quality standards, monitoring and sampling requirements, and enforceability. The only difference from the permit writer's standpoint is that a general permit covers several point sources.  Thus, general permits are fashioned just as individual permits with monitoring and inspection and recordkeeping requirements. . . . Good general permits are no less effective than individual permits; they simply cover more than one discharger.

General Permit Guidance at 3-4.

A general permit's issuance is only possible after the precedent findings of 40 C.F.R. § 122.28(a)(2)(ii) are completed.  Once that five-part similarity finding is made, "the actual development of the general permit can proceed just as for any individual permit." General Permit Guidance at 17.  The only significant difference is that "a larger share of the responsibility for the information gathering process leading up to the development of a general permit falls on the permitting authority rather than on the permit applicants." *Id*. at 33-34.  Moreover, the EPA explained that although the "same types of wastes" must be found to be eligible for a general permit, general permitees can be subject to different effluent limitations and monitoring if circumstances require. General Permit Guidance at 13-15.  For instance, a general permit might require different monitoring timelines or methods for particular dischargers. *Id*. at 15.  Thus, by virtue of being deemed eligible for a general permit, the permitting agency has held that it can properly regulate a class of dischargers without "detailed information about individual

11

disclosures," but the permitting agency also has flexibility to institute specific control mechanisms as necessary.  Therefore, if a general permit is insufficient in some respect, the complaint should be directed at the permitting authority.

Additional authority from 40 C.F.R. § 122.28(b)(2)(i)-(ii) bolsters this conclusion.  There, the EPA explains that "dischargers . . . seeking coverage under a general permit shall submit  . . . a written notice of intent to be covered by the general permit." § 122.28(b)(2)(i).  "A complete and timely notice of intent to be covered in accordance with general permit requirements fulfills the requirements for permit applications for purposes of §§ 122.6, 122.21,[6] and 122.26." *Id*. Continuing, § 122.28(b)(2)(ii) stipulates that the general permit—authored by the permitting agency—shall specify the information a notice of intent must include.  Minimum informational requirements are identified, and among those is that "information necessary for adequate program implementation" must be included. § 122.28(b)(2)(ii).  "Adequate program implementation," albeit specifically undefined, means implementation of the NPDES program—a program with the same pollution requirements for both individual and general permits.[7]  The EPA thus requires general permit writers to solicit information to the extent it is needed to ensure that permit seekers will comply with the law.  Any information deficit is the fault of the permit writer and the government entities that approved that permit.

In summary, all dischargers subject to the CWA begin at the same point—in need of an NPDES permit.  Individual permits are uniquely crafted after a discharger applies to the permitting agency and makes certain disclosures.  A general permit is able to be issued after a permitting agency concludes that sufficient similarities exist that one permit is capable of covering an entire

[6] Section 122.21(a) is the most significant referenced regulation for it explains the permitting process, but excepts general permits from falling under that section's purview. *See* § 122.21(a)(1).

[7] The title of this section is most indicative of the meaning of program: "§ 122.21-Application for a permit (applicable to State programs, see § 123.25)."

12

class of dischargers.  If differences exist between dischargers that are eligible for a general permit, the issuing agency is instructed to reconcile those differences and the requirements imposed by the CWA through information requirements in the notice of intent.  In the end, whether individual or general, each permit must be written to comply with the CWA.  To the extent individual disclosures are necessary for a general permittee, it is the permit writer's responsibility to request that information.  If proper information is not sought, that is the permit writer's failing, and the permitted party should not be subject to an enforcement action. *See* 45 Fed. Reg. 33290, 33311 (May 19, 1980) (If a permittee "complies with its permit, it will not be enforced against for violating some requirement of the appropriate Act which was not a requirement of the permit.").

Sierra Club's second argument is based on the Revised Policy Statement's description of the shield for general permits:

> Section 402(k) also shields discharges of pollutants authorized under a general permit.  EPA's position is that general permits authorize the discharge of all pollutants within the *specified scope* of a particular general permit, subject to all pollutant limits, notification requirements and other conditions within a particular general permit so long as the permittee complies with all EPA application requirements for the general permit.

Revised Policy Statement at 3 (emphasis added).  Sierra Club highlights "specified scope" as language that distinguishes the shield for general and individual permits and restricts the pollutants that can be discharged to only those listed in and limited by the general permit. [R. 42 at 24.]

As explained above, general and individual permits require the same levels of compliance from permittees, and permittees are subject to the same types of enforcement. General Permit Guidance at 3-4.  In that context, it would be anomalous to hold that the permit shield would apply

differently based on the type of permit held by a discharger.  That is especially true when the EPA

has unequivocally stated that a general permit and an individual permit are identical. *Id*.[8]

Precedent also squarely opposes Sierra Club's argument.[9]  In *Atlantic States*, the plaintiff

pursued the same argument Sierra Club advances here: "the discharge of any pollutant not

specifically authorized" in the NPDES permit is prohibited. 12 F.3d at 356.  The Second Circuit

reasoned that interpreting the regulatory framework of the NPDES in that way was opposite of the

manner in which it was meant to function. *Id*. at 357.  Instead, "it is clear that the permit is

intended to identify and limit the most harmful pollutants while leaving the control of the vast

number of other pollutants to disclosure requirements." *Id*.  Indeed, "it is impossible to identify

and rationally limit every chemical or compound present in a discharge of pollutants." *Id*. (quoting

another source).  And, "[c]ompliance with such a permit would be impossible and anybody

seeking to harass a permittee need only analyze that permittee's discharge until determining the

presence of a substance not identified in the permit." *Id.* (quoting another source).

Subsequent cases cited *Atlantic States* favorably, and offered additional explanation for its

conclusion.  In *Ketchikan Pulp Co.*, the EPA explained:

> Although in theory the Agency could structure permits to prohibit the
> discharge of all pollutants except those listed in the permit, such an approach would
> require the Agency to include in the permit a list of every pollutant or combination
> of pollutants that conceivably might be contained in the applicant's wastestreams,
> and to determine which of those pollutants the Agency considered appropriate for
> discharge. Since any given wastestream may contain hundreds of pollutants, such a
> permit-writing approach would be unduly burdensome and costly, and ultimately,
> impractical.  As the Agency has acknowledged: it is impossible to identify and

---

[8] Additional support for the conclusion that Sierra Club is in error is provided by the ambiguity of "specified scope." While in a vacuum "specified scope" may be open to Sierra Club's interpretation, it is at least as likely that it means something else.  For instance, "specified scope" could refer to the geographic limitations of the permit. *See* 40 C.F.R. § 122.28(a)(1).  It could also be referencing the class or category that the general permit is covering: for example, "offshore oil and gas exploration, development, and production facilities," "non-contact cooling water," or "seafood processing." General Permit Guidance at 12-13; *see also* § 122.28(a)(2).

[9] Although the Court notes that the cases from which the following passages are taken involved individual permits, in accordance with the preceding discussion, the Court finds that inconsequential.

> rationally limit every chemical or compound present in a discharge of pollutants. Consequently, the Agency has determined that the goals of the CWA may be more effectively achieved by focusing on the chief pollutants and wastestreams established in effluent guidelines and disclosed by permittees in their permit applications, rather than by attempting to identify the hundreds or thousands of pollutants potentially present in permittees' wastestreams.

7 E.A.D. 605, 1998 WL 284964, at *9 (internal quotation marks omitted); *see also Piney Run Pres. Ass'n*, 268 F.3d at 255 (adopting the EPA's conclusion in *Ketchikan* after subjecting it to a *Chevron* analysis). In clearer parlance, "polluters may discharge pollutants not specifically listed in their permits so long as they comply with the appropriate reporting requirements and abide by any new limitations when imposed on such pollutants." *Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964, at *10 (quoting *Atlantic States*, 12 F.3d at 357).

As acknowledged, disclosure requirements are different for individual and general permits. But they are different only insofar as which party bears the burden for disclosure. For an individual permit, the discharger must disclose all chemicals, wastestreams, and processes, and it receives protection by the shield if it does so. With regard to general permits, the permitting agency bears the burden for understanding the pollutants that might be discharged and writing the permit with appropriate limitations. Further, through the notice of intent process, the permitting agency can ask dischargers for specific information, and to obtain coverage under the general permit, that information must be disclosed. Therefore, while the process for disclosure under each permit is unique, the result is the same.

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict

for the nonmoving party.'"  *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Because there is no factual question and the law favors ICG's position, Sierra Club's motion is denied on Counts One and Two[10] and ICG's motion is granted.[11]

## III.

## A.

The SMCRA, 30 U.S.C. § 1256, requires any person engaging in surface coal mining to obtain a permit.  As noted, states can receive authority from the OSM to issue surface mining permits, § 1256(a), but the state permitting program must be conducted to carry out the provisions of the SMCRA, § 1253(a).  Kentucky operates an OSM-approved permitting program through the KDNR, and ICG possesses a surface mining permit [R. 41, Ex. 4].

Sierra Club alleges that ICG violated its SMCRA permit in three ways.  In Count Three, Sierra Club argues that ICG's selenium discharges exceeded the legal amount.  In Count Four, Sierra Club argues that the specific conductance of waters into which ICG discharged exceeded the permissible narrative standards for that pollutant.[12]  As a result of the aforementioned discharges, Sierra Club claims in Count Five that ICG is in violation of its obligation to install treatment facilities.

ICG opposes Sierra Club's claims by utilizing the CWA's permit shield: "[t]he mere fact that Sierra characterizes its claims for violations related to selenium and conductivity as SMCRA claims, rather than CWA claims, does not allow it to side-step the CWA's permit shield." [R. 40,

---

[10] Sierra Club acknowledges that if no CWA violation is found on Count One it cannot prevail on Count Two. [R. 46 at 12 n.2.]

[11] Because the Court concluded that ICG was allowed to discharge selenium under its general permit, examining the parties' "reasonable contemplation" argument is unnecessary.

[12] Sierra Club has not moved for summary judgment on this count. [R. 42 at 1.]

Ex. 1 at 21.]  "The [SMCRA] cannot serve as a vehicle to impose effluent limits or enforce water

quality standards where the CWA does not authorize such action." [*Id.*]  ICG believes the shield is

applicable to the SMCRA because of Section 702 of the SMCRA (30 U.S.C. § 1292(a), (3)).

Therein, Congress defined the relationship between the SMCRA and the CWA:

> "Nothing in this Act shall be construed as superseding, amending,
> modifying, or repealing . . . any of the following Acts or with any rule or regulation
> promulgated thereunder, including, but not limited to . . . [the CWA], as amended,
> the State laws enacted pursuant thereto, or other Federal laws relating to the
> preservation of water quality."

30 U.S.C. § 1292.

Sierra Club counters that argument by distinguishing effluent limitations, which are

established in accordance with the CWA, and water quality standards, which are relevant to both

the CWA and the SMCRA. [R. 46 at 13-14.]  To read compliance with effluent limitations as

compliance with water quality standards, Sierra Club states, is to render portions of the SMCRA

surplusage—a result Congress could not have intended.  The Court finds that Sierra Club is wrong

on this point with regard to discharges from point sources.  To hold otherwise would violate §

1292 of the SMCRA.  However, ICG is denied summary judgment because of facts presented by

Sierra Club showing that water quality standards may have been violated by nonpoint source

discharges from "areas disturbed by surface mining activities." 30 C.F.R. § 816.42; *see also* 405

KAR 16:070 § 1(1)(g), (2).  Because these factual and legal issues are unresolved, the Court finds

that neither party is entitled to judgment as a matter of law on Counts Three, Four, or Five.

### B.

Congress clearly anticipated that the SMCRA and CWA would intersect and overlap at

certain points.  One of these designed intersections is that before the OSM can delegate its

permitting authority under the SMCRA to a state, that state's program must be approved by the

EPA.  EPA approval is contingent on whether the state program will be carried out in accordance with the CWA's water quality regulations identified below. § 1253(b)(2).

The CWA regulates water quality through the use of effluent limitations and water quality standards.  "'Effluent limitations . . . restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (citing 33 U.S.C. §§ 1311, 1314).  The permitting agency must set effluent limits if pollutants contained in a discharger's outflow "are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria." 40 C.F.R. § 122.44(d)(1)(i).  If a permitting agency conducts the "reasonable potential analysis" and finds that a standard could be violated, permit limitations must be established to ensure compliance. *Nat'l Mining Ass'n v. Jackson*, 2012 WL 3090245, at *2 (D.D.C. July 31, 2012) (citing *Am. Paper Inst. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993).

"'Water quality standards' are, in general, promulgated by the States and establish the desired condition of the waterway." *Arkansas*, 503 U.S. at 101 (citing 33 U.S.C. § 1313).  Section 1313 of the CWA required the establishment of these standards, and it mandates that the standards—either numeric or narrative—receive regular review. § 1313(c).  These standards are significant for they form the rubric against which a discharger's effluent is compared.  That is, "water quality standards by themselves have no effect on pollution; the rubber hits the road when the state-created standards are used as the basis for specific effluent limitations in NPDES permits." *Am. Paper Inst.*, 996 F.2d at 350 (quoted by *Nat'l Mining Ass'n*, 2012 WL 3090245, at *3).

Kentucky operates an OSM-approved permitting program through the KDNR, and ICG possesses a surface mining permit [R. 41, Ex. 4].  ICG's surface mining permit is conditioned upon acceptance of a litany of requirements—as all surface mining permits are—including that "[t]he permittee shall comply fully with all terms and conditions of the permit and all applicable performance standards of KRS Chapter 350 and 405 KAR Chapters 7 through 24." 405 KAR 8:010 § 18(1)(a).  Several regulations of particular relevance to this matter include:

- 405 KAR 16:060 § 1, (3): "All surface mining activities shall be planned and conducted to minimize disturbance of the hydrologic balance in both the permit area and adjacent areas . . . . In no case shall federal and state water quality statutes, regulations, standards, or effluent limitations be violated."
- 405 KAR 16:060 § 6(1), (c): "Surface water quality shall be protected by handling earth materials, groundwater discharges, and run-off in a manner that . . . will not cause or contribute to a violation of any federal or state effluent limitations or water quality standards."
- 405 KAR 16:070 § 1(1)(g), (2): "Discharges of water from areas disturbed by surface mining activities shall at all times be in compliance with all applicable federal and state water quality standards and . . . the effluent limitations established by the KPDES permit  for the operation."
- 405 KAR 16:070 § 1(2): "Adequate facilities, in addition to sedimentation ponds, shall be installed, operated, and maintained to treat any water discharged from disturbed areas when necessary to ensure that the discharge complies with all federal and state laws and regulations and the limitations of this administrative regulation." *See also* 405 KAR 16:060 § 6(2).

Kentucky's water quality standards are located at 401 KAR 10:031.  Numeric standards are listed at 401 KAR 10:031 § 6 tbl.1, and selenium is among the listed pollutants which have restrictions on them with regard to the permissible instream concentrations.  For selenium, the acute concentration must fall below 20 µg/L, and the chronic concentration must not exceed 5 µg/L.[13] Narrative water quality standards are important for this matter with regard only to specific conductance.  401 KAR 10:031 § 4(1)(f) (*see also* 401 KAR 10:031 § 2(1)(d)) limits specific

---

[13] Acute criteria, according to 401 KAR 10:031 § 6 tbl.1 n.6, is "protective of aquatic life based on one (1) hour exposure that does not exceed the criterion for a given pollutant.  Chronic criteria, according to 401 KAR 10:031 § 6 tbl.1 n.7 is "protective of aquatic life based on ninety-six (96) hour exposure that does not exceed the criterion of a given pollutant more than once every three (3) years on the average."

conductance such that its level "shall not be changed to the extent that the indigenous aquatic community is adversely affected."

## C.

Effluent limitations and water quality standards are undoubtedly distinct concepts. "Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." 40 C.F.R. § 131.3(i). "Criteria are elements of State water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." § 131.3(b). Effluent limitations, meanwhile, are "restriction[s] established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." 33 U.S.C. § 1362(11). This distinction is evident in the development of federal water pollution control laws, as explained in *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 202-04 (1976). *See also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149,151-52 (4th Cir. 2000)

Before the CWA was enacted, federal water pollution regulation—both in setting performance standards and justifying enforcement actions—was based on water quality standards. *State Water Res. Control Bd.*, 426 U.S. at 202. Enforcing standards under that system was problematic, foremost because it was difficult to assign culpability to the particular polluter(s) that caused the water quality standards to be exceeded. *Id.* at 202-03. This problem, among others, caused Congress to seek a different solution to minimize water pollution. *Id.* at 203. Congress concluded that regulating the source of the pollution was a better system, "making it unnecessary to work backward from an overpolluted body of water to determine which point sources are

responsible and must be abated." *Id*. at 204.  In achieving that end, the CWA was enacted, and

with it, two important developments. *Id.*  First, polluters would be regulated directly and

individually through the imposition of effluent limitations on point sources. *Id*.  Second, NPDES

permits would be the vehicles through which "generally applicable effluent limitations and other

standards including those based on water quality" would be transformed into specific effluent

limitations. *Id*.  In sum, "the permit defines, and facilitates compliance with, and enforcement of, a

preponderance of a discharger's obligations under the [CWA]." *Id*.; *see also Piney Run Pres.

Ass'n*, 268 F.3d at 265 (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204

F.3d 149, 151 (4th Cir. 2000)); *Am. Paper Inst.*, 996 F.2d at 350 (quoted by *Nat'l Mining Ass'n*,

2012 WL 3090245, at *3); *Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964, at *9.

        Thus, at one time, water quality standards served as the benchmark for water pollution

control and enforcement.  That was an ineffective mechanism resulting in a revised system

whereby water quality standards are foundational to pollution control but have a minimal role in

enforcement.  Compliance, or lack thereof, with NPDES permits is now the enforcement tool for

the CWA.

        This is significant for it undermines, in part, Sierra Club's contention that violations of

water quality standards are subject to enforcement under the SMCRA.  As outlined, it is clear that

Kentucky's SMCRA-related regulations require surface mining operations to comply with state

water quality standards.  Equally explicit is that when the SMCRA is in conflict with the CWA, the

CWA prevails: "where the [SMCRA's] regulation of surface coal mining's hydrologic impact

overlaps the EPA's, the Act expressly directs that the [CWA] and its regulatory framework are to

control so as to afford consistent effluent standards nationwide." *In re Surface Mining Regulation

Litigation*, 627 F.2d at 1367; 30 U.S.C. § 1292(a)(3).  Three conflicts between the CWA and the

SMCRA were discussed in *In re Surface Mining Regulation Litigation* and provide useful illustrations in guiding this Court's decision.

First, the EPA, pursuant to the CWA and its related regulations, provided for a "variance from numerical effluent limitations where special need is demonstrated because it is possible that data which would affect these limitations have not been available." 627 F.2d at 1367.  The OSM did not include that variance as it implemented the SMCRA through various regulations. *Id*.  In essence, the SMCRA and CWA overlapped and the SMCRA set a stricter standard than the CWA. *Id*.  The court explained that even Congress's desire to avoid variances in the SMCRA could not trump the relationship it established between these two statutes. *Id*.

Second, the EPA, under the CWA, exempted dischargers from compliance with effluent limitations due to overflow from sediment control facilities if those facilities were constructed to contain a "10-year, 24-hour precipitation event." *Id.* at 1368.  Under that set of facts, the discharger was absolved of any responsibility if an overflow occurred.  Regulations enacted by the OSM, however, only excused this type of violation if the discharger proved the particular precipitation event occurred. *Id*.  Moreover, the EPA permitted an overflow due to any precipitation event, while the OSM stated the event had to be caused by rainfall. *Id*.  This regulation was suspended during the pendency of the litigation, so the District of Columbia (DC) Circuit refrained from deciding this particular issue, but the court reiterated that the SMCRA and its regulations must not "conflict with the effective EPA provisions as they apply to surface mining operations." *Id*.

The third conflict examined in *In re Surface Mining Regulation Litigation* centered on measurement of suspended solids in waters that passed through surface mines. *Id*. at 1368-69.  The EPA purportedly measured the suspended solids in the water after the mine discharged it and then subtracted pollutants that were present in the water when it arrived at the mine site. *Id*.  The OSM

sought to implement a system in which the concentration of suspended solids was calculated after discharge from the mine site, with no allowance given for pre-existing pollutants. *Id.*  The court concluded that this issue needed clarification and so resisted ruling on it specifically, choosing instead to restate the general proposition that an exemption offered by the EPA cannot be modified or repealed by the SMCRA or implementing regulations.

The factual situation here mirrors that from *In re Surface Mining Regulation Litigation*.  It is abundantly clear that water quality standards and effluent limitations are different.  Statutory amendments tied these two concepts together in a way that now makes them intimately related: effluent limitations are premised on water quality standards and incorporated into NPDES (and state equivalent) permits.  Once an NPDES permit has been issued, assuming a discharger complies with the permit's requirements, water quality standards lose their importance, at least for a case against a discharger.

Building on that foundation, both parties agree that ICG possessed a valid KPDES permit, and the Court has already held that ICG was in compliance with that permit.  Thus, as between these two parties in an enforcement action, effluent limitations have made water quality standards irrelevant.  In other words, water quality standards formed the basis for the effluent limitations imposed on ICG and then effectively "dropped out."  And whether appropriate limitations were imposed to begin with is not a justiciable issue.  In conclusion, to hold that water quality standards for point source discharges are subject to enforcement would modify and/or supersede the NPDES system and impact the CWA in a manner that would violate § 1292 of the SMCRA.

## D.

Although the CWA extensively regulates water pollution, it does have "gaps" the SMCRA is authorized to fill. "[W]here the [CWA] and its underlying regulatory scheme are silent so as to

constitute an 'absence of regulation' or a 'regulatory gap', the [OSM] may issue effluent regulations without regard to EPA practice" to the extent authorized by the SMCRA. *In re Surface Mining Regulation Litigation*, 627 F.2d at 1367.  In *In re Surface Mining Regulation Litigation*, the DC Circuit pointed out that variances and exemptions available under the CWA do not constitute gaps that the SMCRA can fill. *Id*. at 1369.  One of the gaps the court specifically identified as being open to SMCRA regulation was discharges from nonpoint sources—those being any discharge "not emanating from a 'discernible, confined, and discrete conveyance.'" *Id*. at 1367 (citing 33 U.S.C. § 1362(14)).  30 C.F.R. § 816.42, premised on the SMCRA, broadly addresses this gap, requiring "discharges of water from areas disturbed by surface mining activities shall be made in compliance with all applicable State and Federal water quality laws and regulations and with the effluent limitations for coal mining promulgated by the [EPA]." *See also* 405 KAR 16:070 § 1(1)(g), (2); 30 C.F.R. § 715.17.

Since *In re Surface Mining Regulation Litigation* was decided, the obvious gap in regulation of nonpoint sources by the CWA has lessened.  This is the result of a 1987 amendment to the CWA that addressed nonpoint source pollution and established requirements for states regarding this matter. 33 U.S.C. § 1329 (codifying Water Quality Act of 1987, Pub. L. No. 100-4, § 319, 100 Stat. 7, 52).  As a result, determining whether the SMCRA-based regulations can be enforced on nonpoint sources has become more complicated.

The 1987 amendments introduced two significant provisions.  First,  33 U.S.C. 1251(a) was amended to include a new objective for the CWA.  Section 1251(a)(7) was added, and it reads: "it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this Act to be met through

the control of both point and nonpoint sources of pollution." *See* Water Quality Act of 1987, Pub.

L. No. 100-4, § 319, 100 Stat. 7, 60.

Second, 33 U.S.C. § 1329 has numerous sections, but two seem to potentially influence this proceeding. Section 1329(a)(1) mandates that "each state shall, after notice and opportunity for public comment, prepare and submit to the Administrator for approval, a report which" provides information about waters that are affected by nonpoint source pollution to such a degree that additional action will be required for those waters to meet relevant water quality standards. Further, the report should identify the nonpoint sources, at least by category, that are most responsible for the pollution. § 1329(a)(1)(B). Subsection (a)(1)(C) instructs that the report should:

> describe[] the process, including intergovernmental coordination and public participation, for identifying best management practices and measures to control each category and subcategory of nonpoint sources and, where appropriate, particular nonpoint sources identified under subparagraph (B) and to reduce, to the maximum extent practicable, the level of pollution resulting from such category, subcategory, or source.

Finally, (a)(1)(D) asks for states to identify any state or local programs already in place possessing the goal of nonpoint source pollution control.

Section 1329(b), in general, requires states to submit a program designed to control nonpoint source pollution and improve water quality. The program, then, receives review and approval from the EPA. § 1329(b)(1). Although implementation of the pollution management program appears to be binding, subsequent provisions of § 1329(b) suggest that states could avoid adhering to the program because a state possessed inadequate authority under its laws, among other reasons. *See, e.g.* § 1329(b)(2)(D).

*Sierra Club v. Meiburg*, 296 F.3d 199, 224 (11th Cir. 2002), described § 1329 as "generally leav[ing] regulation of non-point source discharges through the implementation

of [total maximum daily loads] to the states." *See also Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 224 (2d. Cir. 2009). *Meiburg* summarizes § 1329 as imposing planning requirements that must be EPA-approved, and once approval has been given, states can avail themselves of grants from the EPA that facilitate program implementation. *Id*. *National Res. Defense Council v. EPA*, 915 F.2d 1314, 1318 (9th Cir. 1990), explains that § 1329 operates through incentives, providing grants to help states adopt nonpoint source management programs, rather than measures that punish noncompliance. *Accord Or. Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1097 (9th Cir. 1998).

The extent of the CWA's regulatory power over nonpoint sources and the relationship between that power and the SMCRA is a salient issue in this litigation because of an ambiguous factual issue. In Sierra Club's motion for summary judgment as to Count Three, several locations are listed as discharging selenium in violation of Kentucky's regulations. [R. 42 at 10-11.] All but one of the listed locations is clearly a point source. [*Id*.] The final location listed is described as "Bonnet Rock Branch." [*Id*. at 11; R. 41, Ex. 17.] It is distinct because of the lack of a particular pond number associated with it. Neither party elaborated on where this sample was taken, but due to the preceding discussion, it is obvious that the determination about whether this is a point or nonpoint source could be critical.

Sierra Club did not move for summary judgment on Count Four, but ICG did. ICG, therefore, has the burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. In applying the summary judgment standard, the Court must review the facts and draw all

26

reasonable inferences in favor of the non-moving party.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255).

The same issue—ascertaining the type of discharge—exists for Count Four as it did with Count Three.  Sierra Club alleges that ICG violated narrative water quality standards by discharging water "of specific conductance at levels that cause adverse effects on aquatic invertebrates." [R. 20 at 17.]  The facts and law surrounding this claim are much less-developed than those for Count Three, but evidence suggests that nonpoint discharges may provide a basis for this claim.  For example, in one of Sierra Club's filings, one of the measurements is described as "Roundhole Branch Upstream of Pond 1807." [R. 41, Ex. 16 at 8.][14]  To avoid ruling on an issue that may not be before the Court, judgment will not be rendered in either party's favor on Counts Three and Five, nor in ICG's favor for Count Four .  Upon further elucidation of the facts and law, summary judgment motions may be reconsidered.

## IV.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

(1)    Summary judgment is **GRANTED** in favor of ICG with regard to Counts One and Two [R. 40];

(2)    Sierra Club's Motion for Summary Judgment as to Counts One and Two is **DENIED** [R. 41];

(3)    ICG's Motion for Summary Judgment as to Counts Three, Four, and Five is **DENIED** [R. 40]; and

---

[14] Resolution of Count Five is dependent upon violations of Counts Three and/or Four.  Accordingly, judgment is denied on this count pending resolution of the previous two counts.

(4)     Sierra Club's Motion for Summary Judgment as to Counts Three and Five is

**DENIED** [R. 41]**.**

This 28th day of September, 2012.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**